Jeffrey Ephraim Glatt, Esq. (NJ #448432023)
Cynthia L. Botello, Esq. (NJ #400062022)
**MCGRAIL & BENSINGER LLP**
888-C 8th Avenue #107
New York, NY 10019
Tel: (516) 603-8145

*Attorneys for Plaintiffs*
*Comprehensive Healthcare Solutions LLC,*
*Shur Family 2021 Trust, Israel Rosenberg,*
*and Shaindl Shur*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Comprehensive Healthcare Solutions LLC, Shur Family 2021 Trust, Israel Rosenberg, and Shaindl Shur, <br><br>        Plaintiffs, <br><br>        v. <br><br>HealthEdge Investment Partners, LLC, TCG Corridor Holdings, LLC, The Corridor Group Holdings, LLC, and CP Corridor AHC, LLC, <br><br>        Defendants. | Civil Action No. <u>3:24-cv-10295</u> |

**<u>COMPLAINT</u>**

Plaintiffs Comprehensive Healthcare Solutions LLC ("Comprehensive"), Shur Family 2021 Trust (the "Trust"), Israel Rosenberg ("Rosenberg"), and Shaindl Shur ("Shur," and collectively, the "Plaintiffs"), for their complaint against defendants HealthEdge Investment Partners, LLC ("HealthEdge"), TCG Corridor Holdings, LLC ("Holdings"), The Corridor Group Holdings, LLC ("TCG"), and CP Corridor AHC, LLC ("CP," and together with Holdings and TCG, "Corridor")[1], upon knowledge as to themselves and otherwise upon information and belief, allege as follows:

## PRELIMINARY STATEMENT

1.    Defendants, private equity companies, made material misrepresentations and omissions to Plaintiffs, owners of a local medical billing business, to induce Plaintiffs to sell their business to Defendants for a lower price than its true value.  Defendants' fraudulent scheme has caused millions of dollars of damages to Plaintiffs.

2.    Plaintiffs, after successfully building their business, sought a purchaser who would first help Plaintiffs grow their business and increase net income before reselling the business. Defendants misrepresented to Plaintiffs that they would do just that.  Defendants repeatedly misrepresented that they would assist Plaintiffs implement their growth strategy for the business, building on Defendants' significant experience collaborating with purchased companies, before reselling the business.  Defendants also misrepresented that any subsequent resale would not occur before 18-24 months from the time of Defendants' negotiations with Plaintiffs.

3.    Defendants, however, concealed from Plaintiffs that they intended to do – and did – just the opposite.  Defendants began the resale process well before closing on the transaction

---

[1] All defendants are collectively referred to as "Defendants."

with Plaintiffs.  Defendants then resold Plaintiffs' business seven months after acquiring it, without first implementing any of Plaintiffs' growth strategies for the Business.

4.    Plaintiffs relied upon Defendants' misrepresentations when negotiating and executing the sale of their business to Defendants.  Indeed, Plaintiffs agreed to receive $2,500,000 via earn-out payment based on Defendants' misrepresentations that they would assist Plaintiffs reach the target to receive this payment.  Plaintiffs likewise agreed to a lower rollover interest and did not seek any purchase price adjustment based solely on Defendants' misrepresentations that there would be no immediate resale.

5.    Defendants also breached the parties' agreement by failing to provide Plaintiffs with accurate and truthful information during the due diligence period leading up to the execution of the agreement.

6.    Even after Defendants' scheme was revealed to Plaintiffs via the resale of Plaintiffs' business, Defendants continued to defraud Plaintiffs by telling Plaintiffs that Defendants would make Plaintiffs whole, and that Plaintiffs need not worry about the profits they lost as a result of the resale.  This too was false.

7.    Plaintiffs have suffered millions of dollars in lost earn-outs, rollover interests, and purchase price adjustments as a direct and proximate cause of Defendants' misrepresentations and concealment, plus the many breaches by Defendants of the parties' agreement.

8.    Defendants should not be rewarded for their fraudulent and breaching actions.

## THE PARTIES

9.    Plaintiff Comprehensive is a limited liability company formed under the laws of New Jersey with its principal place of business at 36 Airport Rd, Lakewood, NJ 08701.

10.    Plaintiff Trust is a traditional grantor trust and owns 60% of Comprehensive.  The trustee of the Trust is Yechiel Yehuda Tauber, an individual domiciled in the State of New Jersey.

2

11.    Plaintiff Rosenberg is an individual domiciled in the State of New Jersey and owns 20% of Comprehensive.

12.    Plaintiff Shur is an individual domiciled in the State of New Jersey and owns 20% of Comprehensive.

13.    Defendant HealthEdge is a limited liability company formed under the laws of Florida with its principal place of business at 5550 W. Executive Drive, Ste 230, Tampa, FL 33609. Upon information and belief, HealthEdge owns a majority interest in Holdings.

14.    Defendant Holdings is a limited liability company formed under the laws of Florida with its principal place of business at 5550 W. Executive Drive, Suite 230, Tampa, FL 33609. Holdings owns 100% of TCG.

15.    Defendant TCG is a limited liability company formed under the laws of Florida with its principal place of business at 9393 W. 110th Street, Suite 100, Overland Park, KS 66210. TCG owns 100% of CP.

16.    Defendant CP is a limited liability company formed under the laws of Florida with its principal place of business at 9393 W. 110th Street, Suite 100, Overland Park, KS 66210.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  This action is between citizens of one or more States and citizens of a foreign State, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.    This Court has personal jurisdiction over Defendants, among other things, (i) by virtue of Defendants' business activities within, and contracts with, the State of New Jersey; and (ii) a substantial portion of Defendants' misconduct described herein occurred in New Jersey.

19.    Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b), since a substantial part of the events giving rise to the claims occurred in New Jersey.

## BACKGROUND

### A. PLAINTIFFS SEEK A PURCHASER FOR THEIR SUCCESSFUL MEDICAL BILLING BUSINESS WHO WOULD HELP GROW THE BUSINESS

20.     Since 2009, Comprehensive has owned and operated Comprehensive A/R Solutions (the "Business"), a successful full-service accounts receivable management company which serves skilled nursing facilities ("SNFs") and related sectors.  The Business offers clients a streamlined system that allows them to focus on patient care, broaden their impact, and focus on the growth of their operations.

21.     Since Covid-19, the Business has experienced significant yearly growth and increased net income.  For example, the Business's EBITDA increased as follows: (i) 2019 - $683,588; (ii) 2020 - $1,333,111; (iii) 2021 - $1,738,978, and (iv) 2022 - $4,001,850.

22.     Indeed, the Business became so successful that it began turning away customers because the current operations were not capable of servicing additional customers.

23.     To that end, in or around early 2022, Plaintiffs began internal discussions on how they could expand the Business to accommodate new customers and further increase net income. Plaintiffs decided to hire an investment banker to market the Business to potential private equity purchasers who would also be able to assist Plaintiffs grow the Business.

24.     Specifically, Plaintiffs hoped to find a purchaser who would not only infuse capital into the Business but who would also work together with Plaintiffs to improve and expand the Business by improving the sales pipeline, increasing services to current customers, reducing expenses offshore, and increasing automation to reduce overall staffing costs (the "Growth Plan").

25.     Plaintiffs knew that implementing the Growth Plan would lead to higher net income for the Business.  Plaintiffs planned on benefiting from such higher net income because Plaintiffs

would only agree to sell the Business if Plaintiffs received an equity interest in the purchaser, enabling them to share in net income.

26.     Plaintiffs also understood that any purchaser would likely eventually resell the Business to another company, as is typical in private equity transactions. However, it was very important to Plaintiffs that any purchaser of the Business first implement the Growth Plan and increase net income before subsequently unloading the Business in a resale to another company.

**B. ROCKSHORE INTRODUCES PLAINTIFFS TO DEFENDANTS**

27.     In or around May 2022, Plaintiffs engaged Rockshore Advisors LLC ("Rockshore") as its investment banker broker to locate purchasers of the Business. After a few months of collecting and analyzing the Business's data, Rockshore created a Confidential Information Memorandum ("CIM") and began marketing the Business to potential purchasers in the private equity healthcare industry.

28.     In or around August 2022, Rockshore, after receiving interest from many companies, presented Plaintiffs with the best five potential purchasers, which included Defendants. As is typical in a private equity transaction, the five potential purchasers each submitted a non-binding Indication of Interest ("IOI") to Plaintiffs, in which they proposed terms for a purchase of the Business.

29.     Over the next few weeks, Plaintiffs reviewed the IOIs and had extensive conversations and meetings with the five potential purchasers. Some of the potential purchasers were primarily interested in acquiring the Business for a quick resale. Defendants, however, touted their collaborative, growth-oriented approach to investing and expressly represented to Plaintiffs that they would assist Plaintiffs implement the Growth Plan for the Business before any subsequent resale.

30.     Specifically, Defendants' IOI, dated August 22, 2022, set forth background information about HealthEdge and Corridor as well as Defendants' strategy for the acquisition of the Business.  Defendants' IOI provides that "HealthEdge is a private equity firm that focuses exclusively on investing in lower middle market healthcare companies.  HealthEdge was founded in 2005 by experienced healthcare investors and operating executives."

31.     Defendants' IOI continues that "HealthEdge invests in companies that will benefit from the knowledge, experience, and network of relationships of its Investment Team and Operating Partners, who have significant operating experience as CEOs, COOs, and CFOs in the healthcare industry."

32.     Importantly, Defendants' IOI explained that "HealthEdge takes a collaborative, growth-oriented approach to investing; partnering with strong management teams and bolstering them with the operational and financial resources needed to accelerate a company's growth trajectory."

33.     Defendants' IOI likewise described HealthEdge's 2012 purchase of a "majority interest" in Corridor, "a trusted business partner to home health, homecare, and hospice providers, specializing in revenue cycle, coding, regulatory compliance, and operational excellence."

34.     Defendants' IOI represented that "[s]ince being purchased by HealthEdge, Corridor has grown from a business of approximately $6 million of revenues in 2012 to approximately $40 million today with strong gross profit and EBITDA margins."

35.     Defendants' IOI made it clear to Plaintiffs that Defendants would collaborate with Plaintiffs to implement the Growth Plan before a subsequent resale.  Plaintiffs thus decided to further explore Defendants' proposal.

**C. DEFENDANTS FRAUDULENTLY MISREPRESENT TO PLAINTIFFS THEIR POST-TRANSACTION PLANS FOR THE BUSINESS**

36.    Plaintiffs and Defendants engaged in extensive communications and negotiations about Defendants' potential acquisition of the Business (the "Transaction").  While Defendants sometimes communicated directly with Plaintiffs, Defendants also communicated with Rockshore, which was acting on behalf of Plaintiffs.

37.    On September 12, 2022, Plaintiffs and Defendants had an extensive meeting at The Hilton Meadowlands in East Rutherford, New Jersey (the "September Meeting").

38.    The following individuals attended the September meeting: (i) Plaintiff Rosenberg, (ii) Plaintiff Shur, (iii) Nathan Sternbuch, a Rockshore broker working on behalf of Plaintiffs, (iv) Des Varady, the CEO of Corridor and an Operating Partner of HealthEdge, (v) Russ Dixon, the COO of Corridor, (vi) Patrick Ryerson, the CFO of Corridor, and (vii) Guy Bryant, an Operating Partner of HealthEdge.

39.    At the September Meeting, Defendants represented to Plaintiffs that they were interested in implementing a robust Growth Plan for the Business post-Transaction before any subsequent resale.  Indeed, Guy Bryant touted HealthEdge's success in collaboratively working together with Des Varady to improve Corridor's operations and net income upon acquisition by HealthEdge.  Defendants also represented that they had no current plans to resell the Business post-Transaction, but that they might resell the Business in approximately 18-24 months.

40.    Defendants continued to repeat these representations to Plaintiffs in further communications between the parties over the next few weeks.  Defendants further represented that any subsequent resale would not occur before 18-24 months from these negotiations, as Defendants would need some time to first assist Plaintiffs implement the Growth Plan.

41.     Additionally, on October 4, 2022, Jessica Hudson, a Principal of HealthEdge, told Plaintiffs, that Defendants only planned "to seek liquidity," *i.e.*, either seek additional infusion of cash or begin marketing the Business for resale, "within the next twelve months," not sooner. Because a typical private equity transaction takes approximately a year from marketing until closing,[2] Defendants again represented that they would not close on a resale of the Business for approximately another 18-24 months.

42.     During that interim period, Defendants represented that they would help implement the Growth Plan. As Hudson told Plaintiffs in this same October 4 email, Defendants were running EBITDA projections for the "next two years" for the "combined businesses" to assess the "synergistic growth opportunities that the two businesses have together." Defendants continued to represent that their focus was on assisting Plaintiffs implement the Growth Plan and increasing net income, not on immediately reselling the Business.

43.     Defendants also continued to tout HealthEdge's longstanding experience assisting companies in the healthcare industry grow their net income. Defendants represented to Plaintiffs that Defendants' strong leadership teams would be able to do the same for the Business.

44.     Defendants' material representations, however, were knowingly false and fraudulent. In truth, Defendants only planned to implement the Growth Plan for the Business if the immediate resale of the Business failed. Defendants true plan was to immediately resell the Business to another company and, to that end, even started the resale process before closing the Transaction.

45.     As Plaintiffs only later (post-Transaction) learned, Defendants had attempted to sell Corridor a few years earlier, but a sale was never consummated. Defendants were thus seeking to

---

[2] *See e.g.,* https://corporatefinanceinstitute.com/resources/valuation/private-equity-transaction-timeline/

purchase the Business, with an expertise in SNFs, to provide added value for their subsequent quick sale of Corridor (which would now include the Business).

46.     Defendants made these material misrepresentations and concealments to induce Plaintiffs to finalize the Transaction and sell the Business to Defendants for a lower value. Defendants' misrepresentations and concealments include (i) that Defendants had previously attempted to sell Corridor, (ii) that Defendants were solely interested in the Business (and its SNF experience) so that they could quickly resell it as part of a sale of Corridor, (iii) that Defendants only planned on assisting the Business implement the Growth Plan if the resale failed, and (iv) that Defendants were actively planning on reselling the Business as soon as possible post-Transaction and planned to start the resale process even before closing the Transaction.

47.     Plaintiffs relied on Defendants' misrepresentations and concealments to continue negotiating with Defendants to finalize (and eventually execute) the Transaction.

**D. DEFENDANTS MAKE FURTHER MISREPRESENTATIONS TO PLAINTIFFS TO INDUCE THEM TO EXECUTE THE TRANSACTION**

48.     On October 7, 2022, Plaintiffs, in reliance on Defendants' misrepresentations, executed a letter of intent (the "LOI") with Defendants with respect to the Transaction.  The LOI memorialized Defendants' misrepresentations that they would assist Plaintiffs implement the Growth Plan and increase net income before reselling the Business.

49.     The LOI also concealed Defendants' true plans to resell the Business as soon as possible post-Transaction and even to start the resale process before closing the Transaction.

50.     Specifically, the LOI provides that Defendants "believe that [the Transaction] represents an exciting opportunity to drive accelerated growth and value creation for Comprehensive and its shareholders."

51.     The LOI further touted Defendants' strategy to partner with "strong management teams" in order to "bolster[] them with the operational and financial resources needed to accelerate [the] company's growth trajectory."

52.     The LOI also contemplated an extensive due diligence period whereby Defendants would "determine the strength of [the Business's] future performance potential," including by "understanding the growth prospects of [the Business]."

53.     After the execution of the LOI, and throughout the due diligence period over the next few months, Defendants continued to make misrepresentations to Plaintiffs and conceal from Plaintiffs their true post-Transaction plans for the Business.

54.     Specifically, Defendants continued to represent to Plaintiffs that they would implement the Growth Plan before reselling the Business.  Defendants even detailed to Plaintiffs the specific ways in which they would assist Plaintiffs implement the Growth Plan.  Defendants also never told Plaintiffs that they had started the resale process before even closing the Transaction.  Defendants made these misrepresentations and omissions to induce Plaintiffs to finalize the Transaction and sell the Business for a lower price than its true value.

55.     For example, in January 2023, during due diligence, Defendants created an "operating financial plan / proforma P&L" for the Business, seeking to "collaborate" with the Plaintiffs "in assuring a good plan to meet or beat $5.75M in EBITDA" in 2023.  A true and correct copy of a 1/20/23 Email from D. Varady to S. Shur and others discussing the plan is attached hereto as Exhibit A.

56.     This operating financial plan created by Defendants followed months of discussions between the parties on how to implement the Growth Plan by improving the Business's sales pipeline, reducing expenses offshore, and increasing automation to reduce overall staffing costs.

57.     Defendants, in this same email, misrepresented that they sought to "work further on this together" with Plaintiffs.  In truth, Defendants had no intent to implement the Growth Plan post-Transaction unless the resale failed, and instead were beginning to start the process to resell the Business before even closing the Transaction.

58.     Moreover, Defendants' concealment of its true plan to resell the Business as soon as possible post-Transaction is further demonstrated by their trips to the Business's vendor in the Philippines with the stated intent to improve the Business's offshore liability and expenses.

59.     Defendants intentionally misled Plaintiffs through various discussions regarding staffing and training at these facilities, including future plans to make the facilities more efficient in these areas.  This was all a ruse – Defendants never intended to assist in these areas post-Transaction unless the resale failed, but rather to immediately resell the Business.  Defendants made these trips to conceal their true intent and actions of beginning the resale process.

60.     The parties during due diligence also extensively discussed the heavy manual processes of the Business, whereby Defendants represented that they had strong capabilities to introduce automation including system and data workflow and robotic process automation.  *See* Ex. A. Again here, Defendants' promises to help introduce automation were simply a way to conceal its true intent, that of an immediate resale of the Business post-Transaction.  *Id.*

61.     Defendants also gave Plaintiffs access to their data room during the due diligence period.  Defendants' data room had a three-year growth module, designed to conceal Defendants' true intent to immediately resell the Business before implementing any growth module.  Again, Defendants intentionally misled Plaintiffs into believing that they would first implement the Growth Plan, and only afterwards resell the Business.

62.     At no point during the entire due diligence period did Defendants ever tell Plaintiffs that they planned to sell the Business immediately post-Transaction and had already begun the resale process by starting to prepare marketing materials to resell the Business to other companies.

63.     In fact, the joint statement drafted by Plaintiffs and Defendants announcing the transaction stated just the opposite.  Defendants would "work[] together" with Plaintiffs to implement the Growth Plan and increase revenue before any subsequent resale.

## E. PLAINTIFFS EXECUTE THE CONTRIBUTION AND ASSET PURCHASE AGREEMENT IN RELIANCE ON DEFENDANTS' MISREPRESENTATIONS

64.     On March 6, 2023, the parties closed the transaction by executing a Contribution and Asset Purchase Agreement between Plaintiffs, as sellers, and Corridor, as purchasers (the "Agreement").  A true and correct copy of the Agreement is attached hereto as Exhibit B.

65.     Pursuant to Section 2.1(a) and 3.4(d) of the Agreement, Plaintiffs transferred a 65% interest in the Business (defined in the Agreement as the "Purchased Assets") to Holdings in exchange for $24,375,000 (the "Closing Cash").  Immediately upon closing of the Transaction, Holdings transferred this 65% interest in the Business to TCG, which immediately transferred it to CP.

66.     Pursuant to Section 2.1(b) and 3.4(d) of the Agreement, Plaintiffs also transferred the remaining 35% interest in the Business to Holdings in exchange for 14.7676% ownership in Holdings (the "Rollover Interest").  The Rollover Interest had a fair market value of $13,125,000 at the time of the execution of the Agreement.  Immediately upon closing of the Transaction, Holdings transferred this 35% interest in the Business to TCG, which immediately transferred it to CP.

67.     Plaintiffs agreed to such a low Rollover Interest (representing only 14.7676% ownership in Holdings) in reliance on Defendants' material misrepresentations (i) that Defendants

would first assist Plaintiffs implement the Growth Plan before reselling the Business post-Transaction and (ii) that Defendants had no active plans to resell the Business. Had Plaintiffs known that Defendants were planning to immediately resell the Business post-Transaction for a significant profit, Plaintiffs would have insisted on either (i) a higher Rollover Interest, or (ii) a purchase price adjustment, either of which would have given them a higher percentage of the profits from the resale. By concealing their plans for, and actions already taken to execute, an immediate resale, as well as the history of their previous failed sale, Defendants defrauded Plaintiffs and caused them damages of millions of dollars.

68.    Pursuant to Section 2.4 of the Agreement, Plaintiffs were also entitled to a $2,500,000 payment if the Business's 2023 EBITDA constituted at least $5,750,000 (the "Earn-Out Payment"). Corridor warranted (*see* "EBITDA" definition in Annex I of the Agreement) that they would use "commercially reasonable efforts to not take unreasonable action to add expenses … that would unfairly impact the potential Earn-Out Payment."

69.    Plaintiffs only agreed to an Earn-Out Payment in reliance on Defendants' misrepresentations that they would not immediately resell the Business but would instead first help Plaintiffs implement the Growth Plan and meet the EBITDA target. Had Defendants informed Plaintiffs of their plan to immediately resell the Business post-Transaction, Plaintiffs would not have agreed to an Earn-Out Payment, as Plaintiffs knew that they would be unable to reach the 2023 EBITDA target during a resale and without Defendants' sole focus on implementing the Growth Plan. Rather, Plaintiffs would have insisted on an additional $2.5 million as part of the Closing Cash.

70.     Defendants fraudulently and knowingly, or at the very least, negligently, made these material misrepresentations to Plaintiffs in order to gain an advantage in the negotiations of the purchase price for the Transaction.

71.     Pursuant to Section 5.8 of the Agreement, Defendants represented that "Neither this Agreement, nor any Transaction Documents, nor any schedule, exhibit or certificate delivered to Seller and Members pursuant to this Agreement or any Transaction Documents, by or on behalf of [Corridor], contains any untrue statement of a material fact or omits to state any material fact required to be stated herein or therein or necessary to make the statements, representations or warranties and information contained herein or therein not misleading."

72.     Defendants certainly breached this provision by their multiple misrepresentations to Plaintiffs and by their failure to provide Plaintiffs with accurate information during the due diligence process.

73.     Pursuant to Section 9.1 of the Agreement, Plaintiffs are entitled to their "reasonable attorneys' fees and costs" in pursuing this litigation against Defendants.

## F. DEFENDANTS FAIL TO ASSIST PLAINTIFFS IMPLEMENT THE GROWTH PLAN AND INSTEAD IMMEDIATELY RESELL THE BUSINESS TO WELLSKY

74.     Despite Defendants' repeated promises to help Plaintiffs implement the Growth Plan post-Transaction before reselling the Business, Defendants actively prevented Plaintiffs from implementing the Growth Plan.

75.     Almost immediately post-Transaction, Defendants introduced "Project Forge," a detailed plan to sell Corridor, which now included the Business.  Other than one cursory meeting with Plaintiffs about implementing the Growth Plan, Defendants failed to assist Plaintiffs implement the Growth Plan.  As a direct cause of Defendants' actions, the Business failed to reach its 2023 EBITDA target and Plaintiffs did not receive the Earn-Out Payment.

76.    Specifically, starting in April 2023, less than a month after the Transaction closed, Defendants' investment banker, Lincoln International ("Lincoln"), began arranging "gold card" meetings with potential purchasers of Corridor.  Now that Corridor included the Business (and its SNF experience), Defendants expected to quickly sell Corridor for a large profit.

77.    Lincoln also shared a presentation (*i.e.*, a CIM), financial model and a quality of earnings report ("QoE") about Corridor with potential purchasers.  These documents, which often take many weeks or months to create, were undoubtedly prepared before the Transaction closed.  In other words, Defendants certainly began reselling the Business well before closing the Transaction, despite their contrary representations to Plaintiffs.

78.    By May 31, 2023, less than two months after closing the Transaction, Defendants received an IOI from WellSky Corporation ("WellSky"), as well as IOIs from a handful of other potential purchasers, for the purchase of Corridor, which now included the Business.

79.    By July 11, 2023, Defendants received an LOI from WellSky and at least one other potential purchaser (the "Other Purchaser").  While Defendants originally entered into aggressive diligence with the Other Purchaser, they ultimately decided to sell Corridor to WellSky.

80.    On or around October 12, 2023, Defendants and WellSky closed on the purchase of Corridor.[3]

81.    Not only did Defendants immediately resell the Business as part of the sale of Corridor, contrary to their prior representations to Plaintiffs, but Defendants actively prevented Plaintiffs from implementing the Growth Plan.  Moreover, because Defendants were heavily involved in implementing Project Forge and the sale of Corridor, they were unable to assist Plaintiffs implement the Growth Plan.

---

[3] https://www.healthedgepartners.com/blog/healthedge-completes-sale-of-corridor-to-wellsky

82.     For example, a presentation that Defendants shared with the board of directors of Corridor in early May 2023 detailed the steps that Defendants had promised Plaintiffs it would implement for the Growth Plan.  The only items marked "mostly complete" were "onboarding" and "backoffice," with the majority of the items marked "in-process" or "next priorities."  These unsatisfied items included "tech," "sales," and "operations," as well as offshore staffing issues. Other than holding one perfunctory meeting with Plaintiffs in May 2023, Defendants failed to even attempt to implement these crucial Growth Plan items.

83.     These Growth Plan items were never implemented because (i) Defendants never had any intention of implementing them unless the resale failed, (ii) Defendants were prevented from implementing them because the Other Purchaser and WellSky wanted Defendants to hold-off on any major changes to the Business while the resale was being negotiated, and/or (iii) Defendants were too busy with the resale of the Business to expend the resources and energy necessary to implement them.

84.     Indeed, the Other Purchaser expressly required Defendants to pause all offshore hiring for the Business while the parties were negotiating the potential purchase of Corridor, severely impacting labor costs for the Business in June and July 2023 and preventing the Growth Plan from being implemented.

85.     Further, Bryant, an Operating Partner of HealthEdge, emailed the board of directors of Corridor in early August 2023 to "ask" that they "not contact Des [Varady, the CEO of Corridor] or his team, as they are busy with closing activities."  Defendants were solely focused on the resale of the Business and thus failed to assist Plaintiffs implement the Growth Plan, contrary to their prior representations.

86.    Shockingly, post-Transaction, Defendants did not even try to hide their fraud from Plaintiffs and instead continued to defraud Plaintiffs.

87.    From the time that the Transaction closed until the end of 2023, Plaintiffs repeatedly inquired what steps Defendants were taking to implement the Growth Plan which would enable Plaintiffs to reach the 2023 EBITDA target and receive the Earn-Out Payment.  Defendants, and particularly Varady, told Plaintiffs that they would reassess the Earn-Out Payment closer to the end of the year, and that Plaintiffs should not worry about the implementation of the Growth Plan because the Defendants were focused on the sale of Corridor.  Defendants, and particularly Varady, also represented to Plaintiffs that if the sale of Corridor was executed and as profitable as predicted (which it was), Defendants would simply overlook the Agreement and pay Plaintiffs the Earn-Out Payment.

88.    These representations were false; Defendants refused to pay the Earn-Out Payment to Plaintiffs despite the extremely profitable sale of Corridor to WellSky.

89.    When it became clear that Plaintiffs would not reach the EBITDA target, Defendants conceded that it was Defendants' lack of assistance implementing the Growth Plan that caused Plaintiffs to lose the Earn-Out Payment.  For example, on December 11, 2023, Ryerson, the CFO of Corridor, emailed Plaintiffs an update on the EBITDA for 2023 and projecting that Plaintiffs would be "a little over $1M shy of the earnout target."  Ryerson admitted that Plaintiffs would likely not receive the Earn-Out Payment because Defendants had failed to implement the Growth Plan and increase net income, which was "staying flat in the June-November timeframe while seeing increasing labor costs."  A true and correct copy of a 12/11/23 Email from P. Ryerson to S. Shur is attached hereto as Exhibit C.

90.     Defendants' actions and misrepresentations have caused Plaintiffs to lose the Earn-Out Payment that they otherwise would have received had Defendants performed as they promised.

## COUNT ONE
## FRAUDULANT INDUCEMENT
### (Plaintiffs against Defendants)

91.     Plaintiffs restate each and every allegation of the foregoing paragraphs as if fully set forth herein.

92.     Defendants made material representations to Plaintiffs to induce them to execute the Transaction, including that: (i) Defendants would assist Plaintiffs implement the Growth Plan post-Transaction before reselling the Business; (ii) Defendants would not resell the Business until approximately 18-24 months from October 2022; (iii) Defendants had no current plans to resell the Business; and that (iv) Defendants would use their experience collaborating with other purchased companies to collaborate with Plaintiffs before any resale of the Business.

93.     Defendants also made material omissions to Plaintiffs to induce them to execute the Transaction, including by failing to inform Plaintiffs that: (i) Defendants had recently failed to sell Corridor; (ii) Defendants were purchasing the Business for the sole purpose of reselling the Business as soon as possible; and that (iii) Defendants had already started preparing marketing materials, including a CIM and QoE, to resell the Business together with Corridor as soon as possible post-Transaction.

94.     Defendants made material representations to Plaintiffs post-Transaction, including that: (i) Defendants would assist Plaintiffs implement the Growth Plan; and (ii) that Plaintiffs should not worry about the implementation of the Growth Plan because if the sale of Corridor was

executed and as profitable as predicted (which it was), Defendants would simply overlook the Agreement and pay Plaintiffs the Earn-Out Payment.

95.     Defendants' misrepresentations and omissions were knowingly and intentionally false and fraudulent when made.  Defendants never had any intent to assist Plaintiffs implement the Growth Plan unless the resale failed, but rather planned to resell the Business as soon as possible post-Transaction.  Defendant even started the resale process before executing the Agreement with Plaintiffs, but intentionally failed to share this key information with Plaintiffs. Defendants knowingly concealed this resale – and the history of the other failed sale of Corridor – from Plaintiffs.

96.     Defendants made these pre-Transaction representations and omissions to induce Plaintiffs to execute the Transaction for a lower price than the true value of the Business. Defendants made these post-Transaction misrepresentations to prevent Plaintiffs from reaching their EBITDA target and receiving the Earn-Out Payment.

97.     Plaintiffs relied upon Defendants' pre-Transaction representations and omissions when negotiating the terms of the Agreement and closing on the Transaction.  Plaintiffs relied upon Defendants' post-Transaction representations and refrained from pressing Defendants further to implement the Growth Plan.

98.     But for Defendants' false representations and omissions, Plaintiffs would not have agreed to (i) receive such a low Rollover Interest as part of the Agreement; (ii) forgo a purchase price adjustment as part of the Transaction; (iii) accept any amount of money as an Earn-Out Payment instead of as Closing Cash; and (iv) refrain from pressing Defendants further to implement the Growth Plan post-Transaction.

99.     As a direct and proximate result of Defendants' false and fraudulent representations and omissions, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $2,500,000.

## COUNT TWO
## NEGLIGENT MISREPRESENTATION
### (Plaintiffs against Defendants)

100.    Plaintiffs restate each and every allegation of the foregoing paragraphs as if fully set forth herein.

101.    Defendants made material representations to Plaintiffs,  to induce them to execute the Transaction, including that: (i) Defendants would assist Plaintiffs implement the Growth Plan post-Transaction before reselling the Business; (ii) Defendants would not resell the Business until approximately 18-24 months from October 2022; (iii) Defendants had no current plans to resell the Business; and that (iv) Defendants would use their experience collaborating with other purchased companies to collaborate with Plaintiffs before any resale of the Business.

102.    Defendants also made material omissions to Plaintiffs to induce them to execute the Transaction, including by failing to inform Plaintiffs that: (i) Defendants had recently failed to sell Corridor; (ii) Defendants were purchasing the Business for the sole purpose of reselling the Business as soon as possible; and that (iii) Defendants had already started preparing marketing materials, including a CIM and QoE, to resell the Business together with Corridor as soon as possible post-Transaction.

103.    Defendants made material representations to Plaintiffs post-Transaction, including that: (i) Defendants would assist Plaintiffs implement the Growth Plan; and (ii) that Plaintiffs should not worry about the implementation of the Growth Plan because if the sale of Corridor was

executed and as profitable as predicted (which it was), Defendants would simply overlook the Agreement and pay Plaintiffs the Earn-Out Payment.

104.   Defendants had a duty to disclose the omitted and concealed facts by virtue of the unique relationship between the parties and because of Defendants' special knowledge of their internal and confidential plans.

105.   Defendants' misrepresentations and omissions were made negligently.  Defendants never had any intent to assist Plaintiffs implement the Growth Plan unless the resale failed, but rather planned to resell the Business as soon as possible post-Transaction.  Defendants negligently concealed this resale – and the history of the other failed sale of Corridor – from Plaintiffs.

106.   Defendants negligently made these pre-Transaction representations and omissions to induce Plaintiffs to execute the Transaction for a lower price than the true value of the Business.  Defendants made these post-Transaction misrepresentations to prevent Plaintiffs from reaching their EBITDA target and receiving the Earn-Out Payment.

107.   Plaintiffs relied upon Defendants' pre-Transaction representations and omissions when negotiating the terms of the Agreement and closing on the Transaction.  Plaintiffs relied upon Defendants' post-Transaction representations and refrained from pressing Defendants further to implement the Growth Plan.

108.   But for Defendants' negligent misrepresentations and omissions, Plaintiffs would not have agreed to (i) receive such a low Rollover Interest as part of the Agreement; (ii) forgo a purchase price adjustment as part of the Transaction; (iii) accept any amount of money as an Earn-Out Payment instead of as Closing Cash; and (iv) refrain from pressing Defendants further to implement the Growth Plan post-Transaction.

109.    As a direct and proximate result of Defendants' negligent misrepresentations and omissions, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $2,500,000.

**COUNT THREE**
**BREACH OF CONTRACT**
**(Plaintiffs against Corridor)**

110.    Plaintiffs restate each and every allegation of the foregoing paragraphs as if fully set forth herein.

111.    The Agreement, dated March 6, 2023, is a valid and enforceable contract.

112.    The Agreement included various representations and warranties of Corridor, including, but not limited to: (i) Section 5.8, in which Defendants represented that "Neither this Agreement, nor any Transaction Documents, nor any schedule, exhibit or certificate delivered to Seller and Members pursuant to this Agreement or any Transaction Documents, by or on behalf of [Corridor], contains any untrue statement of a material fact or omits to state any material fact required to be stated herein or therein or necessary to make the statements, representations or warranties and information contained herein or therein not misleading;" and (ii) Section 2.4 together with Annex I, definition of "Earn-Out Payment," in which Corridor represented that they would use "commercially reasonable efforts to not take unreasonable action to add expenses … that would unfairly impact the potential Earn-Out Payment."

113.    Corridor breached Section 5.8 of the Agreement by making untrue statements, including that (i) Corridor would assist Plaintiffs implement the Growth Plan post-Transaction before reselling the Business; (ii) Corridor would not resell the Business until approximately 18-24 months from October 2022; (iii) Corridor had no current plans to resell the Business; and that

(iv) Corridor would use their experience collaborating with other purchased companies to collaborate with Plaintiffs before any resale of the Business.

114.    Corridor also breached Section 5.8 of the Agreement by making material omissions of necessary facts, including by failing to inform Plaintiffs that: (i) Corridor had recently failed to sell Corridor; (ii) Corridor were purchasing the Business for the sole purpose of reselling the Business as soon as possible; and that (iii) Corridor had already started preparing marketing materials, including a CIM and QoE, to resell the Business together with Corridor as soon as possible post-Transaction.

115.    Corridor also breached Section 2.4 together with Annex I, definition of "Earn-Out Payment," by failing to use "commercially reasonable efforts to not take unreasonable action to add expenses … that would unfairly impact the potential Earn-Out Payment."  Instead, Corridor unfairly impacted the potential Earn-Out Payment by actively preventing Plaintiffs from implementing the Growth Plan.

116.    Plaintiffs have performed all their obligations under the Agreement.

117.    As a direct and proximate result of Corridor's breaches of the Agreement, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $2,500,000.

**COUNT FOUR**
**<u>BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING</u>**
**(Plaintiffs against Corridor)**

118.    Plaintiffs restate each and every allegation of the foregoing paragraphs as if fully set forth herein.

119.    The Agreement had an implied covenant of good faith and fair dealing.

120.    Corridor had an implied obligation to act in good faith to implement the Growth Plan post-Transaction before reselling the Business.

121.    Corridor breached the implied covenant of good faith and fair dealing by (i) failing to act in good faith when they misrepresented their post-Transaction intentions; (ii) beginning to prepare the marketing materials, including a CIM and QoE, to resell the Business before closing the Transaction; and (iii) failing to implement the Growth Plan post-Transaction.

122.    As a direct and proximate result of Corridor's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $2,500,000.

## COUNT FIVE
## PROMISSORY ESTOPPEL
### (Plaintiffs against HealthEdge)

123.    Plaintiffs restate each and every allegation of the foregoing paragraphs as if fully set forth herein.

124.    HealthEdge promised Plaintiffs that it (i) would assist Plaintiffs implement the Growth Plan post-Transaction before reselling the Business; (ii) would not resell the Business until approximately 18-24 months from October 2022; (iii) it had no current plans to resell the Business; and that (iv) it would use its experience collaborating with other purchased companies to collaborate with Plaintiffs before any resale of the Business.

125.    HealthEdge had a reasonable expectation that its assurances would induce Plaintiffs to enter into the Agreement in reliance upon them.

126.    Plaintiffs reasonable relied on HealthEdge's promises when it decided to enter into the Agreement.

127.    HealthEdge failed to comply with their promises, including (i) by failing to assist Plaintiffs implement the Growth Plan and (ii) by reselling the Business before implementing the Growth Plan.

128.    As a direct and proximate result of HealthEdge's failure to comply with its promises, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $2,500,000.

## COUNT SIX
## <u>UNJUST ENRICHMENT</u>
**(Plaintiffs against Defendants)**

129.    Plaintiffs restate each and every allegation of the foregoing paragraphs as if fully set forth herein.

130.    Defendants received a substantial financial benefit through the Transaction and subsequent immediate resale of the Business.

131.    As a direct result of Defendants' misrepresentations, Plaintiffs have experienced significant financial detriment, including (i) the loss of a higher Rollover Interest; (ii) the loss of the benefit of including a purchase price adjustment as part of the Transaction; and (iii) the loss of the Earn-Out Payment.

132.    Defendants' enrichment at the expense of Plaintiffs is unjustifiable under the circumstances.

133.    Plaintiffs lack an adequate legal remedy to recover the losses incurred as a result of Defendants' actions.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs demand judgment against Defendants, awarding Plaintiffs as follows:

(a)    Damages to be determined at trial, including compensatory damages of not less than $2,500,000 and punitive damages of not less than $2,500,000;

(b)     Costs and disbursements of this action, together with attorneys' fees, as set forth in Section 9.1 of the Agreement;

(c)     Pre-judgment interest and post-judgment interest available under law; and

(d)     Such other and further relief as the Court may deem just and proper.

DATED:   November 5, 2024
         New York, New York

MCGRAIL & BENSINGER LLP

_____/s/ Jeffrey Ephraim Glatt_____
Jeffrey Ephraim Glatt, Esq.
Cynthia L. Botello, Esq.
**MCGRAIL & BENSINGER LLP**
888-C 8th Avenue #107
New York, NY 10019
Tel: (516) 603-8145

*Counsel for Plaintiffs Comprehensive Healthcare Solutions LLC, Shur Family 2021 Trust, Israel Rosenberg, and Shaindl Shur*